## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROSCO, INC.,                                  :
                                              :
            Plaintiff,                        :
                                              :
      v.                                      :      C.A. No. 11-117-LPS
                                              :
VELVAC INC.,                                  :
                                              :
            Defendant.                        :

---

Philip A. Rovner, Esquire and Jonathan A. Choa, Esquire of POTTER ANDERSON &
CORROON LLP, Wilmington, DE.
Of Counsel: Steven B. Pokotilow, Esquire of STROOCK & STROOCK & LAVAN LLP, New
York, NY.

      Attorneys for Plaintiff.


Jeffrey B. Bove, Esquire and Karen Riesenburger Poppel, Esquire of CONNOLLY, BOVE,
LODGE & HUTZ LLP, Wilmington, DE.
Of Counsel: John A. Bannon, Esquire of SCHIFF HARDIN LLP, Chicago, IL.

      Attorneys for Defendant.

---

## MEMORANDUM OPINION

December 4, 2012
Wilmington, Delaware.

**STARK, U.S. District Judge**:

Pending before the Court is the issue of claim construction of various disputed terms[1] found in U.S. Patent No. 7,837,338 ("the '338 patent" or "patent-in-suit").

## I.    BACKGROUND

Plaintiff Rosco, Inc. ("Plaintiff" or "Rosco") filed this patent infringement action against defendant Velvac, Inc. ("Defendant" or "Velvac") on February 4, 2011, alleging infringement of the '338 patent, which is entitled "Mirror Mounting Assembly." (Docket Item ("D.I.") 1)[2] The patent-in-suit claims an assembly for mounting a mirror to a motor vehicle. (*See* '338 patent, Background of the Invention, col.1 ll.20-24)

The Court held a *Markman* hearing on November 9, 2011. *See Markman* Hr'g Tr., Nov. 9, 2011 (D.I. 64) (hereinafter "Tr."). After the *Markman* hearing, upon Plaintiff's request, the Court permitted the parties to supplement the claim construction record. (*See* D.I. 105-110) This supplemental briefing was completed on October 22, 2012. (*See* D.I. 108)

## II.   LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for

---

[1]In a separate Order, the Court adopts the parties' agreed-upon construction of "fender portion of the vehicle."

[2]The '338 patent may be found at D.I. 31 Ex. 1.

1

conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach

the appropriate weight to appropriate sources "in light of the statutes and policies that inform

patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . .

[which is] the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321

(internal quotation marks omitted). The patent specification "is always highly relevant to the

claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of

a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular

claim terms," the context of the surrounding words of the claim also must be considered.

*Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted

and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are

normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For

example, the presence of a dependent claim that adds a particular limitation gives rise to a

presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-

15 (internal citation omitted). This "presumption is especially strong when the limitation in

dispute is the only meaningful difference between an independent and dependent claim, and one

party is urging that the limitation in the dependent claim should be read into the independent

2

claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science

3

and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to

ensure that the court's understanding of the technical aspects of the patent is consistent with that

of a person of ordinary skill in the art, or to establish that a particular term in the patent or the

prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose

sight of the fact that "expert reports and testimony [are] generated at the time of and for the

purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.*

Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic

evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim

scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns

with the patent's description of the invention will be, in the end, the correct construction."

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows

that "a claim interpretation that would exclude the inventor's device is rarely the correct

interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III.  REPRESENTATIVE CLAIMS

Claims 1, 11, and 21 are the independent claims of the '338 patent. They are shown

below, with emphasis added to show the claim terms the parties dispute.

### A.  Claim 1

1. A mirror mounting assembly for mounting a mirror on a
vehicle, comprising:

a mirror mounting bracket configured for ***attachment to a
structural portion of the vehicle*** inside an ***engine bay*** of
the vehicle, having first and second sections,

4

the first section sized and positioned for *connection to* the
structural portion *inside the engine bay* of the vehicle
and configured to comprise a width sufficient to be con-
nected to the structural portion using at least two bolts;

the second section being sized and configured to support a
support member; and

said support member supporting said mirror mounting
bracket including a pivot element sized and configured
to be *connected to* and pivotally support the mirror and
to be supported by a fender portion of the vehicle, and
said support member including a support section having
a first leg supporting said mirror mounting bracket, and
a second leg on which the pivot element is coupled
thereto, and said first and second legs of said support
member configured to be shaped in a contour that sub-
stantially conforms to the contour of the fender portion
of the vehicle, said first leg supporting said mirror
mounting bracket resting on, and being supported by, a
top of the fender portion, and said second leg extending
downwardly along and resting on the side of the fender
portion, and said support member substantially in the
shape of an inverted L and reducing vibrations on the
mirror.

## B.    Claim 11

11. A mirror mounting assembly for mounting a mirror on
a *vehicle bulkhead*, comprising:

a mirror mounting bracket configured for *attachment to a
structural portion of the vehicle* inside an *engine bay* of
the vehicle, wherein:

the mounting bracket including a first flange and a sec-
ond flange,

the first flange being sized and configured to be con-
nected to the structural portion *inside the engine bay*
vehicle and configured to comprise a width sufficient
to be *connected to* the structural portion using at least
two bolts; and

5

the second flange being sized and configured to be supported by a support member; and

said support member supporting the second flange, the support member including a pivot element sized and configured to pivotally support the mirror,

wherein the support member having a first leg supporting the second flange of the mounting bracket, and a second leg on which the pivot element supported thereby, and said first and second legs of said support member configured to have a contour that substantially conforms to the contour of a fender portion of the vehicle, said first leg supporting said mirror mounting bracket resting on, and being supported by, a top of the fender portion, and said second leg extending downwardly along and resting on the side of the fender portion, and said support member substantially in the shape of an inverted L and reducing vibrations on the mirror.

## C. Claim 21

21. A mirror mounting assembly for mounting a mirror to a vehicle, comprising:

a support member having a first leg and a second leg and said first and second legs of said support member configured to have a contour that substantially conforms to a contour of a fender portion of the vehicle, said first leg resting on, and being supported by, a top of the fender portion, and said second leg extending downwardly along and resting on the side of the fender portion and substantially in the shape of an inverted L and reducing vibrations on the mirror;

an arm assembly configured to support at one end thereof a mirror unit;

a pivot element supported by the second leg of the support member and configured to pivotally and rotationally support said arm assembly, a side of said support member being shaped to complement a surface of the fender

6

>portion of the vehicle located adjacent a hood portion of
>the vehicle;

>a mounting bracket configured for ***attachment to a struc-***
>***tural portion of the vehicle below the hood of the vehicle***
>and at least part of a section of said mounting bracket
>being ***positioned below the hood when the hood is in a***
>***closed position*** with respect to the vehicle,

>said mounting bracket including a first section for ***connec-***
>***tion to the structural portion of the vehicle*** and config-
>ured to comprise a width sufficient to be connected to the
>structural portion using at least two bolts, and a second
>section sized and configured to support the first leg of
>said support member; and

>said support member being supported and affixed to the
>vehicle by the mounting bracket; and

>said arm assembly being supported by said pivot element
>and said support member.

## IV.   CONSTRUCTION OF DISPUTED TERMS[3]

### A.   "a structural portion of the vehicle" (independent claims 1, 11, 21)

>Plaintiff's Proposed Construction: "A stable, supportive portion of the vehicle,
>providing a connection location of reduced vibration."

---

[3]The Court largely rejects Rosco's contention that the disputed terms do not need to be construed. (D.I. 36 at 1; D.I. 50 at 1) The parties do not agree on the meanings of the disputed terms, and their disputes appear to be material. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *see also generally AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial. It is also the necessary foundation of meaningful appellate review.") (internal citation omitted). Hence, in assessing Rosco's positions, the Court will focus on the constructions proposed by Rosco in the alternative. As is further discussed below, the Court does agree with Rosco that certain of the parties' disputes can be resolved without the Court needing to adopt a particular construction.

7

> Defendant's Proposed Construction: "In 'body-on-frame' or 'chassis cab'
> construction, the 'structural portion of the vehicle' consists of the load-bearing
> steel parts which, when assembled, provide the structural integrity of the vehicle
> essential for operation on the road. In a conventional truck chassis, structural
> portions of the vehicle would include frame rails, crossmembers, and other parts
> of the frame construction. Sheet metal outer body parts, such as fenders, whose
> purpose is primarily cosmetic, are not necessary for the structural integrity or
> roadworthiness of the vehicle and are not 'structural portions of the vehicle.'"

> Court's Construction: "A stable, supportive portion of the vehicle, providing a
> connection location of reduced vibration, but not including sheet metal outer body
> parts – such as fenders – whose purpose is primarily cosmetic."

According to the specification, "it is an object of the present invention to provide a

mounting bracket for a rear view mirror which alleviates the vibration and mounting problems

associated with the prior art devices." ('338 patent, Summary of the Invention, col.2 ll.3-6) The

specification explains that the inventor determined that one cause of vibration in prior art mirror

mounts was mounting the mirror brackets to body panels that were not sufficiently stable and,

therefore, were susceptible to vibration. (*See id.* at col.1 ll.37-41 ("[I]n the prior art mirrors, the

mounting arms are generally fixed to the body panels of the vehicle which also vibrate during

operation of the vehicle . . . ."); *see also id.* at col.1 ll.47-51 (stating concern over "the relatively

thin metal used in constructing motor vehicles," adding that area around mounting holes becomes

rusted and "no longer structurally sound" and "no longer able to adequately hold the mounting

assembly")) The patent explains that this problem can be solved by mounting the mirror brackets

to portions of the vehicle that are stable and supportive enough to ensure reduced vibration. (*See

id.* at col.2 ll.3-15; *see also, e.g., id.* at col.5 ll.10-12 ("The wide dimension of the bracket flange

mounted to the bulkhead provides stability for the mirror in the longitudinal direction of the

vehicle."); *id.* at col.2 ll.31-33 ("At least one additional mounting arm connects the mirror to the

8

vehicle body to provide a stable, at least three point mounting at the side of the vehicle.")) 

Two examples of a "structural portion" are used throughout the specification: "bulkhead" and "frame."[4] But the Court finds no basis to limit the scope of the claims to just these two examples. (*See generally id.* at col.5 ll.23-32 (noting patent contemplates "alternatives, modifications and variations" that "will be apparent to those skilled in the art in light of the disclosure herein"))

Velvac acknowledges that "[a] frame and bulkhead may be part of the structure of the vehicle" and that "there are other parts of the vehicle which would be 'structural portions of the vehicle.'" (D.I. 48, Supplemental Declaration of Michelle Vogler, Ph.D., P.E. ("Vogler Supp. Decl."), ¶ 6; *see also* Tr. at 54) However, Velvac's proposed construction appears to add limitations to the claim that are not merited. (*See, e.g.*, D.I. 37, Declaration of Dr. Hugh Bruck ("Bruck Decl."), ¶ 5) (stating patent-in-suit provides "straightforward meaning" for phrase) Further, Velvac contends that "[o]uter body parts, *like fenders*, are not structural parts and a connection to these parts would not be a connection to a 'structural portion of the vehicle.'" (Vogler Supp. Decl. ¶ 6) (emphasis added) In Velvac's view, a "fender" is not a "structural portion of the vehicle" because Rosco – during prosecution – disclaimed parts such as fenders in distinguishing prior art. (*See* D.I. 39 at 8-12; Tr. at 39-47, 50-51) Velvac has submitted an expert declaration which concludes that "[a] person of ordinary skill in the art would understand Rosco to have clearly and unmistakably disclaimed fenders." (Vogler Supp. Decl. ¶ 9)

---

[4]*See* '338 patent col.2 ll.14-17 ("These two arms of the bracket are configured at one end to be mountable at the engine bay, at preferably, the same points at which the fender is fastened to the vehicle bulkhead or frame."); *id.* at col.3 ll.56-58 ("The end flange 8b is connectable to the bulkhead or frame, preferably by the same bolt which mounts the fender body panel to the frame.")

In an April 21, 2010 Reply to Office Action, the patentee responded to the Examiner's citation of numerous prior art references by stating, "[i]n contrast to the presently claimed invention, each of the secondary references disclose attachment to the *fender*, and not a *structural portion of the vehicle* inside the engine bay." (D.I. 38, Declaration of B. Clayton McCraw ("McCraw Decl."), Ex. B, p. 17 (emphasis in original); *see also id.* at 18; D.I. 36 at 11-12)[5]

Rosco effectively concedes that fenders that are used solely for the purpose of cosmetics are not included as part of the "structural portion of the vehicle":

> The parties have agreed that cosmetic portions of a body panel that cover the wheel should be called a fender. . . . Rosco's [proposed] definition . . . does not attempt to include attachment to thin, cosmetic portions of the vehicle that are neither stable, nor supportive. The claimed bracket is designed to connect to locations on the vehicle that are (i) stable, (ii) supportive, and (iii) provide reduced vibration.

(D.I. 50 at 9)  In explaining its April 21, 2010 statement during prosecution, Rosco states that it "merely highlights that the prior art only disclosed connection to 'external cosmetic body panels

---

[5]The inventor, Mr. Benjamin Englander, also declared that:

> As for the secondary references cited in the November 16, 2009 Office Action – Farnsworth, Zent, Cummins, and Owens – none of these references show attachment to a structural portion of a vehicle as recited in the claims of this patent application.  Instead, one of ordinary skill would understand that the references show attachment to the fender of the vehicle only.  More specifically, *each of these references only connect to the fender*, whereas *Figure 8 of the present application clearly shows that the claimed fender mount attaches to a structural portion which provides a stable connection base*.

(D.I. 40 Ex. 5, First Englander Declaration Under 37 C.F.R. §1.132, ¶ 16 (emphasis added), and Ex. 1, Photo No. 9)

10

that surround and/or cover a portion of the road wheel' and did not disclose a connection to any

'stable, supportive' portions of the vehicle." (*Id.* at 10)

The Court concludes that there has been a clear and unmistakable disavowal of some

claim scope.[6] *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)

(explaining high standard for prosecution disclaimer argument). Specifically, during prosecution

the patentee disavowed connection to prior art "fenders," which are thin, cosmetic portions of the

vehicle that are not stable nor supportive. Thus, while the Court will adopt Rosco's proposed

construction – which construes "a structural portion of the vehicle" in a manner consistent with

the intrinsic evidence – the Court will amend that construction by adding a portion of Velvac's

proposal, to make clear to the jury that this term does not include "sheet metal outer body parts –

such as fenders – whose purpose is primarily cosmetic."

In reaching these conclusions, the Court has considered the prosecution history of U.S.

Patent application No. 12/782,135 ("the '135 Application"), which is a Division of the patent-in-

suit.[7] Regardless of whether the prosecution history of this "child" application is viewed as

intrinsic or extrinsic evidence, the Court finds nothing in the submitted materials that alters the

conclusion of a disclaimer, as explained above. Even assuming Rosco is correct that the

Examiner reviewing the '135 Application – who is the same Examiner who reviewed the patent-

in-suit – "could not have understood that Rosco had disclaimed claim scope" in connection with

---

[6]The Court is not persuaded by Velvac's functional argument, i.e., that Rosco is
impermissibly attempting to define the term by what it does, rather than what it is. (*See* D.I. 39
at 12-13)

[7]Rosco's request to supplement the record with the materials relating to the '135
Application (D.I. 109) is granted.

prosecuting the '338 patent (D.I. 109 at 1) – this Court is obligated to make its own

determination on this point according to the legal standards applicable to litigation. Additionally,

if, as the Court has concluded, Rosco clearly and unmistakably disavowed certain claim scope in

prosecuting the "parent" '338 patent, Rosco could not have somehow reacquired this claim scope

for the '338 patent regardless of what it did in connection with its prosecution of the '135 child

application.

**B.     "attachment to" (independent claims 1, 11, 21)**

Plaintiff's Proposed Construction: "attachment to"

Defendant's Proposed Construction: "'attachment directly to' a structural portion
of the vehicle"

Court's Construction: No construction necessary; plain and ordinary meaning.

The Court's construction is supported by the specification and plain and ordinary

meaning. Velvac seeks to require that the attachment be only a "direct attachment." (*See, e.g.,*

D.I. 39 at 7 n.3, 17; D.I. 46 at 17-18) Yet the specification discusses "attaching," "mounting," or

"connecting" the bracket, or arms of the bracket of the mirror mount. (*See, e.g.,* '338 patent col.2

ll.14-17; *id.* at col.3 ll.49-53; *id.* at col.5 ll.1-3, 10-11; *id.* at Figs. 7-8; D.I. 36 at 13) The

specification does not specify that the attachment must only be by "direct" attachment; nor does

the prosecution history support the addition of such a limitation. (*See* D.I. 36 at 13; D.I. 50 at 15-

16; *see also generally Bradford Co. v. ConTeyor N. Am., Inc.*, 603 F.3d 1262, 1270 (Fed. Cir.

2010) (construing "coupled to" as not being limited to direct attachment, but instead

"constru[ing] broadly so as to allow an indirect attachment"); *Genentech, Inc. v. Chiron Corp.*,

112 F.3d 495, 501 (Fed. Cir. 1997) ("To be joined or connected does not necessitate a *direct*

joining or connection.")) Instead, as Rosco explains, the specification describes "direct"

attachment only with respect to some embodiments. (*See* D.I. 36 at 14; *see, e.g.*, '338 patent

col.2 1.35 ("mounting the arms directly to"))

### C.   "connection to" and "connected to" (independent claims 1, 11, 21)

Plaintiff's Proposed Construction: "connection to"

Defendant's Proposed Construction: "'connection directly to' and 'connected directly to' a structural portion of the vehicle"

Court's Construction: No construction necessary; plain and ordinary meaning.

The dispute with respect to these terms is the same as the dispute just addressed regarding

the term "attachment to." For the same reasons, the Court agrees with Rosco that the terms are

not limited to "direct" connections. (*See* D.I. 36 at 15; Bruck Decl. ¶ 9)

### D.   "engine bay" (independent claims 1, 11)

Plaintiff's Proposed Construction: "The general area of the vehicle housing the engine, including the engine compartment."

Defendant's Proposed Construction: "The space within the vehicle in which the engine is mounted, defined by (i) the radiator and/or radiator support at the front, (ii) the 'dash panel' bulkhead at the rear, (iii) the side bulkheads on the right and left sides, (iv) the underside of the hood on top, and (v) the vehicle frame underneath."

Court's Construction: "The general area of the vehicle housing the engine, including the engine compartment."

The parties' dispute is essentially whether the term "engine bay" refers to a "general

area," as Plaintiff contends, or is instead more strictly delineated, as Defendant argues. The

Court agrees with Plaintiff.

When the specification uses the term "engine bay," it does so in a more general manner

13

than Defendant's construction would allow. (*See, e.g.*, '338 patent col.2 ll.14-17 ("These two arms of the bracket are configured at one end to be mountable at the engine bay at, preferably, the same points at which the fender is fastened to the vehicle bulkhead or frame."); *see also generally id.* at col. 3 ll.49-52 ("The second end of the support arms 6a, 6b is attached to a bracket 8 that is configured to be mounted to the bulkhead or frame of the vehicle in the vicinity of the engine compartment.")) Thus, as Rosco argues, "interpreting the engine bay as a general location is supported, including regions such as the upper walls of the engine compartment where the fender fastens to the vehicle (1), the side edges above the upper walls of the engine compartment, adjacent the hood (2), the general vicinity of the engine compartment (3), the surface of the fender forming the overall perimeter of the engine compartment (4), and the side walls of the engine compartment adjacent the area where the vehicle hood is opened and closed (5)." (D.I. 36 at 16) The Court agrees with Rosco that "discrete boundaries" or "attempt[s] to add up to a fixed perimeter" are absent from the specification. (*See id.*)

**E.**   **"inside the engine bay" (independent claims 1, 11)**

Plaintiff's Proposed Construction: "Inside the engine bay."

Defendant's Proposed Construction: "Located within the engine bay."

Court's Construction: No construction necessary; plain and ordinary meaning.

The Court finds that nothing helpful is accomplished by Velvac's proposal to rewrite "inside the engine bay" to mean "located within the engine bay." The Court does not find a meaningful dispute that requires resolution by adoption of a claim construction. *See generally U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (stating that claim construction should not become "an obligatory exercise in redundancy"). No construction is

14

necessary. The term will be given its plain and ordinary meaning.

### F. "below the hood of the vehicle" (independent claim 21)

Plaintiff's Proposed Construction: "At a level below the hood when the hood is in a closed position."

Defendant's Proposed Construction: "At a level below the underside of the hood when the hood is in a closed position."

Court's Construction: "At a level below the hood when the hood is in a closed position."

The Court agrees with Rosco that Velvac's introduction of the word "underside" into its proposal adds unhelpful ambiguity. (*See* D.I. 36 at 18; D.I. 39 at 20) The specification states that "[t]he central portion of the bracket fits between the side edge of the vehicle hood and the wall of the engine compartment when the hood is closed." ('338 patent col.2 ll.28-30; *see also id.* at col. 2 ll.49-50 ("The narrow leg of the bracket extends from the engine compartment."); *id.* at col.4 ll.52-54 ("The angle is selected so as to correspond to the side wall of the engine compartment opening so as to permit opening and closing of the vehicle hood."); *id.* at Figs. 7-8) There is no mention of the hood's underside. (*See* D.I. 36 at 18; D.I. 50 at 17-18)

### G. "positioned below the hood when the hood is in a closed position" (independent claim 21)

Plaintiff's Proposed Construction: "Located at a level below the hood when the hood is in a closed position."

Defendant's Proposed Construction: "Located at a level below the underside of the hood when the hood is in a closed position."

Court's Construction: "Located at a level below the hood when the hood is in a closed position."

For the same reasons given above with respect to the "below the hood of the vehicle"

term, the Court reaches the same conclusion with respect to this term.

**H.     "vehicle bulkhead" or "bulkhead" (independent claim 11)**

Plaintiff's Proposed Construction: "The side portions of the engine bay."

Defendant's Proposed Construction: "As used in the '338 patent, the term 'vehicle bulkhead' or 'bulkhead' refers to the interior side panels that comprise the side walls of the engine bay, to which, among other things, the vehicle fenders are attached."

Court's Construction: "The side portions of the engine bay."

The specification supports Rosco's contention that, in the context of the patent-in-suit, "bulkhead" refers "generally, to the side walls of the engine compartment." (D.I. 36 at 20)  For example, the specification states that "[t]he second end of the support arms 6a, 6b is attached to a bracket 8 that is configured to be mounted to the bulkhead or frame of the vehicle in the vicinity of the engine compartment." ('338 patent col.3 ll.49-52; *see also id.* at Abstract ("A pair of brackets are configured to conform to an engine bay side wall of the vehicle.")) By contrast, Velvac's more precise delineation of the bulkhead is not supported.

Additionally, the patent's "Brief Description of the Drawings" labels multiple figures as showing a "bulkhead." ('338 patent col.3 ll.9-21) Figures 2, 3, 4, 7, and 8 all illustrate side portions of the engine bay. As Rosco explains: "As clarified by the purpose of the invention, these are side portions stable enough to reduce vibration for mirror mounting applications, and one of ordinary skill in the art would understand that in this context, the bulkhead refers generally to side portions of the engine bay." (D.I. 36 at 19; *see also* Bruck Decl. ¶ 14)

16

## V.   CONCLUSION

For the reasons given above, the Court will construe the terms of the patent-in-suit

consistent with this Memorandum Opinion.   An appropriate Order will be entered.